**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Frances Rutigliano, individually and on behalf of herself and all others similarly situated,<br><br>                Plaintiff,<br><br>   v.<br><br><br>Cooperative Regions of Organic Producer Pools d/b/a Organic Valley, a Wisconsin Corporation,<br><br>                Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff, Frances Rutigliano ("Plaintiff"), on behalf of herself and all others similarly situated, brings this class action against Defendant, Cooperative Regions of Organic Producer Pools d/b/a Organic Valley, a Wisconsin Corporation, ("Defendant" or "Organic Valley"), and alleges on personal knowledge, investigation of her counsel, and information and belief as follows:

## NATURE OF THE ACTION

1.     Defendant, Organic Valley, is one of the largest sellers of organic milk products in the United States. Defendant labels its milk-based products[1] as being manufactured through humane animal practices.[2]

2.     Plaintiff and Class Members purchased the Products because of Defendant's Humane Farming representations and omissions and paid premium prices for the Products.

3.     The treatment of farm animals has been widely documented, with abusive conditions being common for animals raised on large-scale dairy farms.

4.     Increasingly, consumers have become aware of these injustices, creating a growing market segment of consumers who purchase products from companies that promise better protections for animals.

5.     Defendant takes advantage of this consumer preference by touting its Products' labeling with the Humane Farming claims.

6.     Contrary to Defendant's Humane Farming representations, Defendant sells the Products while committing needless cruelty to animals.

7.     Unbeknownst to consumers, Defendant's Products come from cows whose calves are stripped from them within days or hours of birth. These calves are then reared in isolation

---

[1] The Products subject to this Complaint are all milk-based products that are sold under the Organic Valley brand name. Defendant's milk-based products will be collectively referred to herein as the "Products." Plaintiff reserves the right to amend the list of Products subject to this Complaint throughout discovery. The labels of the different varieties of Products are substantially similar in the representations made to consumers regarding the ethical treatment of the cows used to create the Products.

[2] The false and misleading words and images on the Products' labeling which form the basis of this Complaint include but are not limited to: Organic Valley has a "commitment to the highest . . . animal care practices"; Organic Valley employs "Humane Animal Practices"; that these "high standards of animal care go above and beyond" other standards since "the best milk comes from happy cows"; "We Hold Ourselves to the Highest Standards"; "OUR COWS ARE SOCIAL AND SO ARE WE"; Organic Valley farms are "growing real food the right way"; Organic Valley raises cows with "LOVE." These labeling statements, together with suggestive imagery described and depicted herein, are made in a uniform manner and are otherwise substantially similar in nature among the Products. Together, these representations will be collectively referred to herein as the "Humane Farming" representations and/or omissions.

hutches, often in poor health without vital socialization and natural sustenance. Male calves are quickly sold for eventual commercial slaughter, while female calves go on to give birth to calves who are immediately taken away from them.

8.      As such, Defendant's practices are not "humane" and do not comport with established "highest standards" of animal care "above and beyond other standards"—including the provision of "social" settings—that, as shown below, Defendant touts on its Product labels.

9.      Instead, Defendant's Humane Farming representations and omissions are false and misleading to reasonable consumers such as Plaintiff and Class Members. This is especially true given the context of the representations—including, for example, as shown below, cartons showing a mother cow and calf together in an open field, in direct contrast to Defendant's actual practices.

10.     Defendant's Humane Farming representations are important to consumers seeking humane alternatives to conventionally produced dairy products. Research shows these consumers are willing to pay more for milk from production systems that do not involve premature separation of cows and calves.

11.     Defendant can and does sell its Products for premium prices because of its Humane Farming claims. Defendant's labeling representations and omissions, targeted at consumers who care about the humane treatment of animals, deceive consumers about the true nature of its business practices and cause Plaintiff and other consumers to pay premium prices. It is these premium prices that regularly provide Defendant more than $1.1 billion in annual sales, including more than $1.2 billion in recorded sales for the year ending 2020.[3]

---

[3] Organic Valley, *Press Release: Organic Valley Upholds Mission to Sustain Family Farms, Hits Record $1.2 Billion in Sales* (Jun. 9, 2021), available at https://www.organicvalley.coop/newspress/organic-valley-upholds-mission-sustain-family-farms-hits- record-12-billion-sales/.

12.     Defendant's multiple and prominent systematic mislabeling of the Products form a pattern of unlawful and unfair business practices that deceives and harms consumers and the public.

13.     Accordingly, Plaintiff brings this suit on behalf of herself and similarly situated consumers who purchased Defendant's Products. Plaintiff and Class Members were damaged because they would not have purchased or would not have paid a premium for Defendant's Products had they known the truth regarding the Products' Humane Farming representations and omissions.

14.     Plaintiff and Class Members purchased the Products and paid a premium for Defendant's Products over comparable products that were not promoted with the misrepresentations at issue here. Plaintiff brings this lawsuit to recover damages for the purchase price of the deceptively labeled Products on behalf of herself and Class Members.

## **PARTIES**

15.     Plaintiff Frances Rutigliano is a resident and citizen of New York residing in Yorktown Heights, New York. She purchased many Organic Valley Products, including but not limited to: Whole Milk, Reduced Fat 2% Milk, and Grassmilk Half & Half on numerous occasions during the Class Period, including in 2022, in New York, and most recently purchased Organic Valley Grassmilk Half & Half at Whole Foods located in Chappaqua, New York and DeCicco & Sons in Somers, New York.

16.     Before purchasing Defendant's Products, Plaintiff Rutigliano reviewed the Products' labels and other marketing regarding the Products. As a result of the Humane Farming claims and omissions, Plaintiff Rutigliano paid an increased cost for the Products, which were worth less than represented because the Humane Farming claims and omissions were not true

and were highly misleading. Plaintiff Rutigliano paid a price premium for false promises of humane animal treatment that Defendant did not keep.

17.     Defendant Organic Valley is headquartered in Wisconsin, located at 1 Organic Way, La Farge, Wisconsin 54639-6604. Defendant is a citizen of Wisconsin. Defendant is one of the largest organic dairy sellers in the world. Defendant markets and sells its products in all 50 states, including New York, and exports to 25 countries. Defendant boasts well over a hundred member farms across New York State and the New York metropolitan area, the welfare policies and practices of which are subject to Defendant's oversight and control, and which Defendant regularly inspects and investigates. On information and belief, these farms supply the Products marketed and sold to Plaintiff.

18.     Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

## JURISDICTION AND VENUE

19.     This Court has personal jurisdiction over Defendant in this matter. Acts and omissions giving rise to this action occurred in the state of New York, including sale of the Products to Plaintiff in Chappaqua and Somers, New York. Defendant has been afforded due process because it has, at all times relevant to this matter, individually or through its agents, subsidiaries, officers and/or representatives, operated, conducted, engaged in and carried on a business venture in this state and/or maintained an office or agency in this state, and/or marketed, advertised, manufactured, distributed and/or sold products, committed a statutory violation within this state related to the allegations made herein, and caused injuries to Plaintiff and

putative Class Members, which arose out of the acts and omissions that occurred in the state of New York, during the relevant time period, at which time Defendant was engaged in business activities through the marketing, sale, and manufacture of the Products in the state of New York.

20.     This Court has subject matter jurisdiction over this matter under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). There are at least 100 members in the proposed class, the aggregated claims of the individual class members exceed the sum or value of $5,000,000.00 exclusive of interest and costs, and some of the members of the proposed class are citizens of states different from the Defendant.

21.     Pursuant to 28 U.S.C. § 1391(b), venue is proper because a substantial part of the events giving rise to the claims asserted occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because Defendant conducts substantial business in this District, has sufficient minimum contacts with this District, and otherwise purposely avails itself of the markets in this District, through the promotion, sale, and marketing of the Products in this District. Venue is also proper because Plaintiff resides in this District.

## COMMON FACTUAL ALLEGATIONS

22.     A growing number of consumers believe it is important that the food industry treat farmed animals—including cows used by the dairy industry—humanely, and with attention to their needs and natural behaviors. Like Plaintiff, many consumers base their purchasing decisions on their perceptions of animal welfare and are willing to pay a premium to sellers who source their dairy products from cows who are treated well and allowed to engage in natural behaviors, like raising their young.

23.     Cows, especially, are acutely sensitive animals. They experience a wide range of both positive and negative emotional states. Positive emotions include joy, pleasure, and

excitement, often manifesting in play behaviors. But cows can also experience fear and frustration. Fear can manifest in behaviors such as hesitancy to enter new spaces, defecation, vocalizations, and escape attempts. More subtle physical changes are also associated with shifts in emotion, such as nasal temperatures, ear posture, heart rate, and eye-widening in which a higher percentage of white space is visible below a cow's upper eyelid. The latter is associated with frustration and fear, as are other negative behaviors, such as aggression, repetitive pacing, certain vocalizations, and headshaking.

24.     Cows are also very social animals. Like humans, cows are capable of emotional contagion—the spread of positive or negative emotions throughout a group. When one cow exhibits fear or distress in response to a stimulus, other cows who witness her response may also experience fear or distress. Cows also provide emotional support to one another. Studies have shown that following a stressful event, cows will prioritize seeking out a non-stressed companion over food.[4]

25.     Unsurprisingly, cows' cognitive, emotional, and physical well-being are all inextricably linked to their social needs. As shown below, social rearing and experiences, particularly early in life, are a necessary and crucial part of normal psychological development in cows just as they are in humans. Cows are social herd animals who crave companionship, and calves raised together, as they would be in more natural settings, learn from each other. Bonds between mother cows and their babies from birth through the months-long, normal weaning process are similarly vital to cow development and wellbeing. When cows are allowed to meet these crucial needs, they can thrive. When these needs are unfulfilled, they suffer.

---

[4] *See, e.g.,* Lori Marino & Kristin Allen, *The Psychology of Cows*, 4(4) Animal Behavior & Cognition 474, 483-84 (2017), https://dx.doi.org/10.26451/abc.04.04.06.2017.

26.    Defendant is one of the world's largest dairy manufacturers, and it knows the importance of consumer perceptions of animal treatment to the dairy industry. As Defendant's vice president of brand management and innovation explained in November 2021, "concerns regarding animal treatment" are "a narrative threatening the dairy industry."[5]

27.    Defendant also knows that there is growing consumer demand for humanely sourced products. Indeed, new research published in 2022 reported that 86 percent of shoppers purchase food products with labels that they overwhelmingly believe indicate higher welfare production practices—and consciously pay more to do so.[6] Likewise, a 2018 survey by a national research firm found that 76 percent of consumers shopping at conventional grocery stores, and 87 percent of consumers at premium/natural grocery stores, including consumers of dairy products, say they are concerned about the welfare of animals raised for food.[7] Results were similar across every demographic group.[8]

28.    Consumer preference for humanely sourced products is further evidenced by a 2018 survey by a research firm supporting food service clients, which found that close to a third of supermarket industry decision-makers are motivated to stock products that promise better animal welfare and that 70 percent of those stocking products with humane claims report that sales from these products have increased.[9]

---

[5] Anna Boisseau, *2021 State of the Industry: Milk is on a Long and Winding Road*, DairyFoods (Nov. 5, 2021), available at https://www.dairyfoods.com/articles/95315-2021-state-of-the-industry-milk-is- on-a-long-and-winding-road.

[6] Melissa Thibault, Sharon Pailler, & Daisy Freund, *Why Are They Buying It?: United States Consumers' Intentions When Purchasing Meat, Eggs, and Dairy With Welfare-related Labels*, 7(12) Food Ethics 16-17 (Apr. 23, 2022) https://doi.org/10.1007/s41055-022-00105-3.

[7] Bob Meadow and Meryl O'Bryan, *Results from a Survey of American Consumers, Lake Research Partners* (Feb. 1, 2019), available at https://www.aspca.org/sites/default/files/aspca-2018_animal_welfare_labelling_ and_ consumer_concern_survey.pdf.

[8] *Id*.

[9] The American Society for the Prevention of Cruelty to Animals and Technomic Inc., *Understanding Retailers' Animal Welfare Priorities* (2018), available at https://www.aspca.org/sites/default/files/aspca_2018_understanding _ retailers_animal_welfare_prioritie s.pdf.

29.     Instead of combatting this narrative by rigorously enforcing comprehensive humane standards, Defendant, one of the world's largest dairy manufacturers, uses its marketing to mask its poor treatment of cows—advertising itself as providing uniquely humane animal welfare-branded dairy products with false and misleading Humane Farming claims to drive up profits.

### A.  Defendant's Products Prominently Feature the Humane Farming Claims

30.     At all relevant times, Defendant has marketed its Products consistently and uniformly with respect to Humane Farming representations. Defendant sells the Products in all 50 states in various grocery stores, including in New York.

31.     Aware of the consumer preference for humanely sourced products, especially humanely sourced dairy products, Defendant specifically advertises its Products with the Humane Farming claims, including but not limited to:

- Organic Valley has a "commitment to the highest . . . animal care practices";

- Organic Valley employs "Humane Animal Practices";

- That these "high standards of animal care go above and beyond" other standards since "the best milk comes from happy cows";

- "We Hold Ourselves to the Highest Standards";

- "OUR COWS ARE SOCIAL AND SO ARE WE";

- Organic Valley farms are "growing real food the right way";

- Organic Valley raises cows with "LOVE."

32.     The Humane Farming claims are prominently displayed to every consumer who shops for milk-based products and sees Defendant's Products in the grocery aisle—frequently, as seen in the cartons below, alongside suggestive images of human mothers with their own children as well as images of cows in natural-seeming settings:





33.    In addition to the Humane Farming representations seen above, Defendant also sells cartons depicting an image of what any reasonable consumer would infer to be a mother cow and her calf:



34.    A reasonable consumer, like Plaintiff and Class Members, would understand from each of the representations described above that Defendant does not engage in needless, inhumane cruelty toward farmed animals, such as by separating cow mothers and babies within days or hours of birth, or by raising calves in a manner that deprives them of vital social bonding, health, and natural sustenance, or by engaging in practices beneath the requirements of other prominent third-party animal welfare standards. Plaintiff and Class Members would not have paid

a premium price for the Products if they had known the true nature of Defendant's practices and that the Humane Farming claims were false, as set forth herein.

### B. Defendant's Humane Farming Claims Are Material to Reasonable Consumers

35.    Defendant uses these false and misleading Humane Farming representations to induce reasonable consumers like Plaintiff and the Class members to purchase the Products. Early separation of mother cows from their babies is a particular cruelty of the dairy industry. The babies of many other categories of farmed mammals—such as sheep, pigs, horses, and cows used for beef—are frequently housed with their mothers for some meaningful period of time. Cows used in dairy production are an exception, one that reasonable consumers are unaware of due to deceptive packaging like Defendant's.

36.    Consumers are willing to pay a price premium for humanely marketed products, especially dairy products like Defendant's Products.

37.    According to one study published in 2020, research regarding the "overwhelming" views on calf housing options among American youth and adults lends itself to the conclusion that "housing systems that enable greater degrees of behavioral freedom [including socialization] for calves may be more socially sustainable for the dairy sector."[10] This is consistent with other published studies showing that separation of mother and baby cows is a subject of particular concern, and is considered an unacceptable practice to many reasonable consumers—and linked to such consumers' willingness to pay more.

38.    For example, a 2015 study including hundreds of diverse U.S.-based consumers found significant majorities agreeing that mother and baby cows should not be separated

---

[10] Rielle K. Perttu, Beth A. Ventura, & Marcia I. Endres, *Youth and Adult Public Views of Dairy Calf Housing Options*, 103(9) J. of Dairy Sci. 8507-8517 (Jul. 1, 2020), https://doi.org/10.3168/jds.2019-17727.

early—even after reviewing common arguments for and against these practices.[11] Unsurprisingly, these consumers left the study tending to believe cows were cognitively and emotionally complex and would suffer undue acute and long-lasting psychological, physiological, and behavioral consequences from early maternal separation.

39.     Furthermore, during a study conducted among North American consumers in 2010 and 2011 with a diverse sample of participants, more than three-quarters of those with no prior involvement in the dairy industry answered negatively when asked "Should dairy calves be separated from the cow within the first few hours after birth?" citing concerns including the emotional and physiological health of cow mothers and babies.[12] Notably, "No" was also a popular response to this question among participants with some knowledge of dairy industry standards, such as readers of trade publications, veterinarians, industry professionals, and even participants recruited at an actual dairy industry conference.[13]

40.     Even well-informed consumers disapprove of these practices. Indeed, consumers surveyed in 2014 both before and after a self-guided tour of a 500-cow dairy farm emerged more, rather than less, concerned about the premature separation of mother and calf.[14]

41.     In a 2022 study, researchers surveyed a representative sample of close to 2,000 participants, including 1,487 Americans, who were provided descriptions of cow-calf

---

[11] Gesa Busch, Daniel M. Weary, Achim Spiller, & Marina A. von Keyserlingk, *American and German Attitudes Towards Cow-Calf Separation on Dairy Farms*, 12(3) PloS one e0174013 (Mar. 16, 2017), https://doi.org/10.1371/journal.pone.0174013.

[12] Beth A. Ventura , Marina A. von Keyserlingk, Catherine A. Schuppli, & Daniel M. Weary, *Views on Contentious Practices in Dairy Farming: The Case of Early Cow-Calf Separation*, 96(9) J. of DairySci., 6105–6116. (Sep. 2013), https://doi.org/10.3168/jds.2012-6040.

[13] *Id*.

[14] Beth A. Ventura, Marina A. von Keyserlingk, Hannah Wittman, & Daniel M. Weary, *What Difference Does a Visit Make? Changes in Animal Welfare Perceptions after Interested Citizens Tour a Dairy Farm*, 11(5) PloS one e0154733 (May 31, 2016), https://doi.org/10.1371/journal.pone.0154733.

management systems differing in types of social and maternal contact allowed.[15] The results suggested "low acceptance of any cow-calf management system involving early separation," and that these participants considered "that early separation was a breach of [the] standard of care owed to both cows and calves."[16] All categories of participants, including those who drink milk, expressed unfavorable attitudes "toward all systems involving early separation from the mother, regardless of what form of additional social contact was provided."[17]

42.    Consistent with prior studies, participants explained that their attitudes and willingness to pay premium prices were inextricably linked to their perceptions of animal welfare. Participants expressed willingness to pay the same or more for milk from cows who were not separated from their calves prematurely.[18] This was reinforced in qualitative findings offered by participants, who frequently described premature maternal separation as, for example, "disappointing to learn," "unnatural," "shocking," "upsetting," "devastating," "unacceptable," "inhumane," "unethical," and "cruel" because, as many volunteered, "[a]ny baby needs their mother."[19]

43.    Despite Defendant's Humane Farming claims, it is well aware that its business practices are not humane—that cows used to make the Products are cruelly separated from their calves soon after birth, and calves are cruelly isolated. As such, Defendant misleads and deceives trusting and reasonable consumers like Plaintiff and Class Members to believe that they are purchasing such Products while omitting from the Products' labeling the fact that its business

---

[15] Lara V. Sirovica, Caroline Ritter, Hendricks, J., Daniel M. Weary, Sumeet Gulati, & Marina A. von Keyserlingk, *Public Attitude Toward and Perceptions of Dairy Cattle Welfare in Cow-Calf Management Systems Differing in Type of Social and Maternal Contact*, 105(4) J. of Dairy Sci. 3248–3268 (Jan. 28, 2022), https://doi.org/10.3168/jds.2021-21344.
[16] *Id.* at 3248.
[17] *Id.* at 3257.
[18] *Id.* at 3258-65
[19] *Id*. at 3261-64.

practices are not humane—that cows used to make the Products are cruelly separated from their calves soon after birth, and that calves are cruelly isolated.

### C.  Unfortunately for Consumers, Defendant's Humane Farming Claims Are False

44.    Defendant preys on consumer desire for more humanely-treated animals—doing so while systematically mistreating  cows that produce the milk in its Products.

#### i.  Defendant's Premature Separation of Mother Cows and Calves Inflicts Undue Suffering.

45.    In more humane settings, mother cows and calves form strong emotional bonds immediately after birth. Just as human mothers and their babies benefit from direct physical contact, cow mothers bond with their babies by rubbing, sniffing, remaining close to, licking, and suckling their calves after birth.

46.    Afterwards, mother cows and calves engage in what are referred to as "contact calls," with calves as young as three to five weeks old able to recognize their mothers based on distinct vocal cues. Mother cows remain protective of their calves. For example, in one study, 99 percent of mother cows moved between an unfamiliar approaching vehicle and their calves to provide a protective barrier, despite the apparent risk.[20] In another study, mothers who were separated from their calves after only five minutes still recognized their own babies even after 12 hours of separation.[21]

47.    There is also physiological evidence of these bonds. Cow mothers who are separated from their calves display increased eye whites, which often indicates fear, stress, or frustration, in addition to other behavioral signs of trauma. Cow mothers who are reunited with

---

[20] Marino & Allen, *The Psychology of Cows*, *supra* note 4 at 487.
[21] *Id*. at 484.

their calves display significantly less eye whites, indicating a more positive, calm emotional state.

48.     Mother-calf bonds can also take on unique, individualized characteristics. As referenced, calves are able to selectively respond to their own mother's calls even after a day of separation. Maternal attention, including time spent nursing, is sensitive to individual differences in calf sex and weight. For example, male calves tend to benefit from more frequent nursing and protective behavior compared with female calves. Additionally, more maternal protection and more frequent nursing occurs when calves are born with lower birth weights.

49.     Contrary to Defendant's Humane Farming claims, Defendant's common practice is to inhumanely separate cow mother and baby immediately after birth. Defendant disclosed to the Cornucopia Institute, an organic industry-aligned third-party, that its calves are "[r]emoved shortly after birth (standard practice)."[22] Thus, within days or potentially even hours of the birth of a baby calf on Defendant's farms, each calf is ripped from his or her mother and never returned.

50.     The pain and suffering this inflicts is immense and needless. Mother cows separated from their calves display various signs of acute distress, including pacing, increased urination, weight loss, increase in stress hormone concentration, locomotor activity including searching behavior, and vocalizing. These behaviors can continue for days. All mother cows in one study exhibited these signs of distress after separation and chose to stay at one end of their paddock, vocalizing continuously.[23] It can also, and often does, include attempts by mother cows to struggle against the removal of their calves and to chase after them.

---

[22] The Cornucopia Institute, *Grassmilk (Organic Valley)* (last accessed May 31, 2022), available at https://www.cornucopia.org/scorecard/dairy/grassmilk-organic-valley/.
[23] Marino & Allen, *The Psychology of Cows*, *supra* note 4 at 484.

51.     Separated calves display many of these same clinical signs of suffering, including increases in vocalization, stress hormone concentration, weight loss, stress behaviors, and "reuniting behaviors," including forlornly hugging a fence line and standing with heads outside their pens. Earlier weaning also results in less play of all kinds, depriving calves of an important source of emotional enrichment and learning opportunities. Calves who are prematurely separated are also more likely to engage in cross-sucking, or abnormal sucking behavior, and may form an oral fixation with their enclosure that causes them to suck on fixtures or suck on the body of another calf. The latter can cause milk loss in the sucked calf as well as digestive disorders and diarrhea in the sucking calf.

52.     Many of these effects persist for the separated calves. Calves raised without their mothers are more inclined to respond fearfully to unknown objects or confrontations with unknown cows. One study found that calves allowed continual access to their mothers in their first 12 weeks of life were more likely to engage in positive activities like exploration, more likely to socialize with other cows, less prone to aggressive postures, and less likely to respond to new situations with stress and fear.[24] Conversely, other studies have demonstrated that adult cows who had suffered early maternal deprivation are less sociable, less able to provide maternal care for their own young, display more behavioral signs of stress, and are less able to cope with new challenges or stimuli.[25]

---

[24] Kathrin Wagner, Daniel Seitner, Kerstin Barth, Rupert Palme, Adreas Futschik, & Susanne Waiblinger, *Effects of Mother Versus Artificial Rearing During the First 12 Weeks of Life on Challenge Responses of Dairy Cows*, 164 Applied Animal Behaviour Sci. 1-11 (2015), https://r.jordan.im/download/mammals/wagner2015.pdf.

[25] *See, e.g.*, Rebecca K. Meagher, Annabelle Beaver, Daniel M. Weary, & Marina A. von Keyserlingk, *Invited review: A Systematic Review of the Effects of Prolonged Cow-Calf Contact on Behavior, Welfare, and Productivity*, 102(7) J. of Dairy Sci. 5765–5783 (May 15, 2019), https://doi.org/10.3168/jds.2018-16021; Marino & Allen, *The Psychology of Cows, supra* note 4; Rolnei R. Daros, Joao H. Costa, Marina J. Hötzel, & Daniel M. Weary, *Separation From the Dam Causes Negative Judgement Bias in Dairy Calves*, 9(5) PloS one e98429 (May 21, 2014), https://doi.org/10.1371/journal.pone.0098429; Tasja Kälber & Kerstin Barth, *Practical Implications of Suckling Systems for Dairy Calves in Organic Production Systems - A Review*, 64(1) LandbauforschungVolkenrode 45-58 (Mar. 2014); Kathrin Wagner, Kerstin Barth, Edna Hillmann, Rupert Palme, Andreas Futschik, & Susanne Waiblinger,

53.     Early separation may increase susceptibility to serious, even deadly, diseases in both mothers and babies. Stress in cows and calves can be especially high when calves are separated early in life when the bond between them is strongest and calves are most socially dependent on their mothers.

54.     There is no sufficient welfare or commercial justification for Defendant's practice of premature separation of cow mothers and babies. Many commercial alternatives to separation are available, including systems in which mother cows and their babies have unrestricted access to each other or at least daily contact. Such systems exist, are viable in the U.S., and are common globally, including in countries imposing the types of stronger animal welfare standards Defendant purports to represent to consumers.

55.     Severing of maternal bonds causes separated cows not only emotional distress, but also physiological harm that is costly to both cows and calves. Numerous studies have established that abrupt and premature weaning impairs immune responses in calves, such as by impairing the function of cellular and other defenses against pathogens necessary to prevent potentially deadly infections.[26] Likewise, there are no protective benefits from the premature separation that cannot be achieved through more humane means. Calves reared by their mothers will tend to have higher survival rates.

56.     Further evidence for the commercial viability of alternatives to Defendant's inhumane practices, and for the literal falsity of its claims to apply the "highest" animal welfare practices that go "above and beyond" other standards, is supplied by various third-party animal welfare standards for cows used in dairy production. Indeed, a prominent certifier recommends

---

*Mother Rearing of Dairy Calves: Reactions to Isolation and to Confrontation with an Unfamiliar Conspecific in a New Environment*, 147 Applied Animal Behavior Sci. 43-54 (2013).

[26] *See, e.g.*, Kälber & Barth, *Practical Implications of Suckling Systems*, *supra* note 25; Eilish Lynch *et al.*, *Effect of Abrupt Weaning at Housing on Leukocyte Distribution, Functional Activity of Neutrophils, and Acute Phase Protein Response of Beef Calves*, 6 BMC Vet Res 39 (2010), https://doi.org/10.1186/1746-6148-6-39.

husbandry systems "that allow young calves to remain in the herd with their mothers until weaning occurs naturally," with separation of a mother cow and calf to occur only when doing so can "cause as little stress as possible."[27] To qualify for the top two tiers of another certifier's six levels of certification, sellers are required to allow calves to stay with their mothers for at least 168 days, or otherwise make sure calves are fostered for at least 168 days by another nursing cow who is assigned no more than three calves.[28] Despite its promises, Defendant, on information and belief, does not meet these standards.

### ii. Defendant's Isolation of Calves Inflicts Undue Suffering.

57.    In more natural settings, mother cows introduce their young to other calves to form social groups where they learn how to become well-functioning, healthy adults.

58.    In such settings, calves socialize freely. This includes engaging in and deriving significant welfare benefits from, vigorous social play—activities such as play-fighting, galloping, bucking, and kicking. Calves begin engaging in these sorts of play behaviors around the second week of life, actively seek companions, and play the most around the age of four months. Calves raised with peers tend to engage in more play. Socialization also helps calves engage in other forms of social learning. For example, cows allowed to interact with experienced grazers will pick up grazing behaviors more quickly. In addition, calves raised with peers may be able to smell food odors on the breath of their companions, making them more willing to consume new foods.

---

[27] Animal Welfare Approved by AGW, *Certified Animal Welfare Approved by AGW Standards for Dairy Cattle* (last visited May 31, 2022), available at https://agreenerworld.org/wpcontent/uploads/2022/02/AWA-Dairy-Cattle-Standards-2021-v2.pdf.

[28] Global Animal Partnership, *5-Step® Animal Welfare Pilot Standards for Dairy Cattle v1.1* (Dec. 9, 2021), available at https://globalanimalpartnership.org/wp-content/uploads/2022/01/20211209-G.A.P.-5-Step-Standards-for-Dairy-Cattle-v1.1.pdf.

59.     Cows raised together will form strong, complex, individualized social bonds. If raised in proximity to their peers, cows learn to interact with favored peers with compatible personalities. Cows can differentiate amongst their cow peers in a variety of circumstances and retain information about individual cows for extended periods of time. In multiple studies, cows have shown skill at discriminating between photographs of familiar and unfamiliar cows.[29] Calves who are raised together will often be seen lying together, as well as engaging in social behaviors including showing affection and grooming each other. These behaviors help maintain bonds and group cohesion, and can produce positive emotional responses. Raising cows together also carries other long-term psychological and physiological benefits. Studies routinely show calves raised with more social interaction eat more, gain more weight, are more likely to eat new foods, are better learners, are less fearful, are less reactive to humans, and retain more ability to cope with change—among various signs of contentment and security.[30] Additionally, calves are highly motivated to seek out full body contact with other calves.

---

[29] Marino & Allen, *The Psychology of Cows*, *supra* note 4 at 478-79.

[30] *See, e.g.*, Joao H. Costa, Marina A. von Keyserlingk, & Daniel M. Weary, *Invited Review: Effects of Group Housing of Dairy Calves on Behavior, Cognition, Performance, and Health*, 99(4) J. of Dairy Sci. 2453–2467 (Feb. 10, 2016), https://doi.org/10.3168/jds.2015-10144; Rebecca K. Meagher, Rolnei R. Daros, Joao H. Costa, Marina A. von Keyserlingk, Maria J. Hötzel, & Daniel M. Weary, *Effects of Degree and Timing of Social Housing on Reversal Learning and Response to Novel Objects in Dairy Calves*, 10(8) PloS one e0132828 (Aug. 14, 2014), https://doi.org/10.1371/journal.pone.0132828; Margit B. Jensen & Lars E. Larsen, *Effects of Level of Social Contact on Dairy Calf Behavior and Health*, 97(8) J. of Dairy Sci. 5035–5044 (Aug. 2014) https://doi.org/10.3168/jds.2013-7311; Joao H. Costa, Rolnei R. Daros, Marina A. von Keyserlingk, & Daniel M. Weary, *Complex Social Housing Reduces Food Neophobia in Dairy Calves*, 97(12) J. of Dairy Sci. 7804–7810 (Oct. 11, 2014), https://doi.org/10.3168/jds.2014-8392; Margit B. Jensen & Daniel M. Weary, *Group Housing and Milk Feeding of Dairy Calves*, 25 WCDS Advances in Dairy Tech. 179-189 (2013), https://wcds.ualberta.ca/wpcontent/uploads/sites/57/wcds_archive/Archive/2013/Manuscripts/p%20179%20- %20192%20Jensen.pdf; Andreia De Paula Vieira, Anne Marie B. de Passillé, & Daniel M. Weary, *Effects of the Early Social Environment on Behavioral Responses of Dairy Calves to Novel Events*, 95(9) J. of Dairy Sci. 5149–5155 (Sep. 1, 2012), https://doi.org/10.3168/jds.2011-5073; Linda R. Duve, Daniel M. Weary, Ulrich Halekoh, & Margit B. Jensen, *The Effects of Social Contact and Milk Allowance on Responses to Handling, Play, and Social Behavior in Young Dairy Calves*, 95(11) J. of Dairy Sci. 6571–6581 (Nov. 2012), https://doi.org/10.3168/jds.2011-5170.

60.     Defendant, on information and belief, denies calves these demonstrated benefits, raising many calves for dairy production in individual isolation pens. These unfortunate calves are housed in individual hutches—small four-sided pens usually constructed of fiberglass, polyethylene, or wood. Calves are either tethered to hutches or restricted by fencing. While in these hutches, calves are alone, isolated from their mothers and other members of their species, until they reach an age where they will rejoin the herd, be impregnated, and begin to produce milk.

61.     On information and belief, some farms supplying Defendant rear female calves in these small hutches, including but far from limited to those pictured below in photographs available online and on Google Earth of farms supplying Defendant located across New York State, the New York metropolitan area, and throughout the east coast:





62.    The suffering isolation causes is immense in both the short and long term. As with

other species, research has shown that isolation results in behavioral and developmental harm to

calves. Absent sufficient opportunities for interaction, calves will resort to unsatisfying

redirected behaviors such as licking or sucking on fixtures in their pens, as well as on their own

fur and skin. Calves reared in isolation show symptoms of physical, cognitive, sensory, and social deprivation, including both short and long-term difficulties in coping with novel situations and poorer learning abilities compared with group-housed and mother-raised calves.

63. No sufficient welfare or commercial justification exists for Defendant's isolation of calves. Many alternative systems exist and operate in the U.S. and globally, and such systems can be profitable. Social housing improves calves' welfare without compromising calf health or necessarily increasing expense. For example, all health risks associated with social housing can be mitigated with basic management, while the health benefits and weight gains from social housing are manifest.

64. Further evidence for the commercial viability of alternatives to Defendant's practices, and that Defendant's claims that it applies the "highest" animal welfare practices that go "above and beyond" other standards are misleading, are supplied by various third-party animal welfare standards for cows used in dairy production. For example, one prominent certifier requires that all weaned calves "must be kept in groups of familiar animals."[31] To qualify for even the lowest of any of the six tiers of another certifier's six levels of certification, sellers are required to allow calves who are not kept with their mothers or with nurse cows to be kept with small groups of other calves, or at least in the same sex pair, and to have visual contact with other calves. This requirement is moot for sellers meeting this certifier's top two tiers of certification, as they are required to keep calves with their mothers or else with nurse cows.[32] Despite its

---

[31] Animal Welfare Approved by AGW, *Certified Animal Welfare Approved by AGW Standards for Dairy Cattle*, *supra* note 27.

[32] Global Animal Partnership, *5-Step® Animal Welfare Pilot Standards*, *supra* note 28.

representations to the contrary, Defendant, on information and belief, does not meet these standards.

### iii.     Defendant Deprives Calves of Adequate Sustenance and Inflicts Undue Suffering.

65.     Standard practice in the dairy industry results in feeding individually-reared calves minimal sustenance, far below what they would consume from their mother. Defendant, despite its advertising, on information and belief, follows similar practices and deprives these calves of adequate milk.

66.     These practices are associated with poor growth and chronic hunger in calves. Early in life, it is difficult for calves to ingest sufficient amounts of feed to meet their nutrient demands when fed artificially. Studies routinely find a large discrepancy between the amount of milk consumed by calves raised in insufficient social environments on dairy farms, and the far larger amount calves will drink when allowed to suckle freely in more natural settings.[33]

67.     Hunger is not the only condition that causes calves deprived of milk to suffer. A contributing factor to the reduction in beneficial play behavior shown by newly separated calves is reduced energy intake. Lack of sufficient nutrients reduces immune health and resilience to lower temperatures, and can itself cause numerous painful and deadly conditions. Conversely, when calves can feed at will, they show fewer abnormal behaviors, higher rumination, increased play behavior, and improved mortality rates.

---

[33] *See, e.g.*, Costa, von Keyserlingk, & Weary, *Effects of Group Housing of Dairy Calves*, *supra* note 30; Costa, Daros, von Keyserlingk, & Weary, *Complex Social Housing*, *supra* note 30; Jensen & Larsen, *Effects of Level of Social Contact*, *supra* note 30; Jensen & Weary, *Group Housing and Milk Feeding*, *supra* note 30; De Paula Vieira, de Passillé, & Weary, *Effects of the Early Social Environment*, *supra* note 30; Andreia De Paula Vieira, Marina A. von Keyserlingk, & Daniel M. Weary, *Presence of an Older Weaned Companion Influences Feeding Behavior and Improves Performance of Dairy Calves Before and After Weaning From Milk*, 95(6) J. of Dairy Sci. 3218–3224(Jun. 2012), https://doi.org/10.3168/jds.2011-4821.

68.     No sufficient welfare or commercial justification exists for the deprivation inflicted, on information and belief, by Defendant. Rather, as one would expect from the basic facts of cow physiology, cognition, and social structure, this lack of sustenance stems from the needless practices discussed above.

69.     Further evidence for the commercial viability of alternatives to Defendant's practices, and that its claims of applying the "highest" animal welfare practices that go "above and beyond" other standards are misleading, is supplied by various third-party animal welfare standards for cows used in dairy production that, as elaborated above, instruct sellers not to wean calves until an appropriate age. Despite its promises, Defendant, on information and belief, does not meet these standards.

### iv.     Defendant's Cows Suffer Until Death.

70.     Within the dairy industry, male calves' eventual destination, following their sale into the meat industry, is typically a commercial slaughterhouse. Likewise, at their new facilities or locations, female calves are either raised as "herd replacement" for the dairy business or sold to other businesses, so that they can continue this cycle. If they did not previously succumb to conditions caused by their deprivation, females who are no longer at peak commercial value after their milk production levels drop will typically end up at the slaughterhouse too.

71.     The natural lifespan of a cow is 15-20 years. Nevertheless, despite Defendant's advertising, the ultimate fate of male calves born on their farms, after short lives of deprivation, is being shipped to commercial farms that raise them for meat. Ultimately, on information and belief, all of Defendant's cows who survive long enough to see their milk production levels drop—Defendant is listed by Cornucopia as having a "[m]oderate cull/death

rate" that "[w]ill vary widely between farms"[34]—will be sold and suffer premature deaths via a captive bolt to the skull and exsanguination at commercial "slaughter plants."[35]

72.     According to Defendant, these cows are killed after being "stunned with a captive bolt in the middle of the skull and then the[ir] throat is slit to bleed them out."[36]

## CLASS ACTION ALLEGATIONS

73.     Plaintiff brings this action on behalf of herself and the following Class pursuant to Fed. R. Civ. P. 23(a) and (b)(3). Specifically, the Class is defined as:

> All persons residing in New York who, during the Class Period, purchased the Products primarily for personal, family, or household purposes, and not for resale Class.

74.     Excluded from the Class are (a) any person who purchased the Products for resale and not for personal or household use, (b) any officers, directors, or employees, or immediate family members of the officers, directors or employees, of any Defendant or any entity in which a Defendant has a controlling interest, (c) any legal counsel or employee of legal counsel for any Defendant, (d) the presiding Judge in this lawsuit, as well as the Judge's staff and their immediate family members, and (e) Class Counsel.

75.     Plaintiff reserves the right to amend the Class' definition at a later date as necessary to conform with facts learned through discovery.

76.     As used herein, "Class Members" or "Class" shall mean and refer to the members of the Class, including Plaintiff Rutigliano.

77.     The "Class Period" shall encompass all sales from September 2, 2019 through the date of entry of class certification (the "Class Period").

---

[34] The Cornucopia Institute, Grassmilk, *supra* note 22.
[35] *What are Organic Prairie's slaughter practices?*, Organic Valley (Jan. 21, 2020), available at https://organicvalley.force.com/custhelp/s/article/What-are-Organic-Prairies-slaughter-practices.
[36] *Id*.

78.     Plaintiff seeks monetary damages and restitution on behalf of herself and the Class Members. Plaintiff disclaims any intent or right to seek any recovery in this action for personal injuries, wrongful death, or emotional distress suffered by herself and/or the Class Members.

79.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. On information and belief, members of the Class number in at least the thousands. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and the Court.

80.     **Typicality – Federal Rule of Civil Procedure 23(a)(3).** The claims of the representative Plaintiff are typical in that Plaintiff, like all Class Members, purchased Defendant's Products that were marketed and distributed by Defendant. Plaintiff, like all Class Members, has been damaged by Defendant's misconduct in that, *inter alia*, she purchased and paid a premium for dairy products that Defendant represented in a particular manner on the product packaging, and was misled. Furthermore, the factual bases of Defendant's misconduct are common to all Class Members and represent a common thread of fraudulent, deliberate, and negligent misconduct resulting in injury to Plaintiff and all Class Members.

81.     **Predominance of Common Questions of Law and Fact – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** There are numerous questions of law and fact common to Plaintiff and Class Members that predominate over any individual questions. These common legal and factual issues include the following:

  a.  Whether Defendant's Humane Farming representations and/or omissions regarding the Products are false and/or misleading;

b.  Whether Defendant knowingly sold its Products when it knew its Humane Farming claims were false;

c.  Whether Defendant engaged in false and/or deceptive advertising;

d.  Whether the Humane Farming representations and/or omissions regarding the Products were material to a reasonable consumer;

e.  Whether Plaintiff and the Class Members did not receive the benefit of their bargain when purchasing the Products;

f.  Whether Defendant's actions as described above violate the New York Deceptive Trade Practices Act, New York Gen. Bus. Law § 349, *et seq.*;

g.  Whether Defendant's actions as described above violate the New York Deceptive Trade Practices Act, New York Gen. Bus. Law § 350, *et seq.*;

h.  Whether Plaintiff and Class Members have sustained monetary loss and the proper remedy for and measure of that loss;

i.  Whether Defendant's conduct violated public policy; and

j.  Whether Defendant should be required to make restitution, disgorge profits, reimburse losses, and pay damages as a result of the above-described practices;

82.  **Adequacy – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff will fairly and adequately protect the interests of Class Members. Plaintiff has retained attorneys experienced in the prosecution of class actions, including consumer and false advertising class actions, and Plaintiff intends to prosecute this action vigorously.

83.  **Superiority – Federal Rule of Civil Procedure 23(b)(3).** Plaintiff and Class Members have all suffered harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of

the relatively small size of Class Members' individual claims, few Class Members could likely afford to seek legal redress for Defendant's misconduct. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

## CAUSES OF ACTION

### COUNT I

**Violation of the New York Deceptive Trade Practices Act,**
**New York Gen. Bus. Law § 349, *et seq*.**
**(On behalf of the Class)**

84.     Plaintiff re-alleges and incorporates by reference the allegations contained in the previous paragraphs as though set forth fully herein.

85.     Plaintiff brings this Count on behalf of herself and the Class against Defendant.

86.     Because of the acts set forth above, Defendant has been and is engaged in deceptive acts or practices in the conduct of a business, trade, or commerce in violation of New York's General Business Law § 349.

87.     Defendant engaged in unfair and/or deceptive conduct by, *inter alia*, making the Humane Farming representations and omissions on the Products' labeling and in marketing materials.

88.     Defendant's material misrepresentations are the Humane Farming representations.

89.     Defendant's omissions are its failure to describe the practices discussed above, including the early separation of calves, isolation of calves, deprivation of adequate sustenance, and suffering until death, after having made the Humane Farming representations.

90.     The public is likely to be damaged because of Defendant's deceptive trade practices or acts. Specifically, Defendant's false, deceptive, or misleading statements implicate general consumer-oriented conduct because Defendant sells and distributes its Products to consumers in supermarkets and grocery stores throughout New York.

91.     Defendant directs its conduct at consumers, as Defendant's false, deceptive, or misleading statements and omissions are contained in marketing targeted toward consumers, including retail product packaging. As such, Defendant's conduct as alleged herein is consumer oriented.

92.     Defendant's deceptive acts, as stated above, are likely to mislead a reasonable consumer acting reasonably under the circumstances.

93.     Defendant's deceptive acts affect the public interest in the state of New York because consumers located in New York, including Plaintiff and the Class, have purchased Defendant's Products in reliance on Defendant's false, deceptive, and/or misleading statements and omissions.

94.     Defendant's advertising and the Products' mislabeling, and omissions induced Plaintiff and the Class to purchase Defendant's Products at a premium price.

95.     Defendant's deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiff and the Class have been damaged thereby.

96.     As a result of Defendant's use of employment of unfair or deceptive acts or business practices, Plaintiff and each of the other Members of the Class have sustained damages and are entitled to statutory damages of $50 per unit purchased.

<u>**COUNT II**</u>

**Violation of the New York Deceptive Trade Practice Act,
New York Gen. Bus. Law § 350, *et seq*.
(On behalf of the Class)**

97.     Plaintiff re-alleges and incorporates by reference the allegations contained in the previous paragraphs as though set forth fully herein

98.     Plaintiff brings this Count on behalf of herself and the Class against Defendant.

99.     Defendant has made material, false or misleading statements or representations of fact about the Products. Specifically, Defendant has literally, impliedly, or by necessary implication made the Humane Farming representations and omissions, which are not true.

100.    Defendant's acts and omissions constitute false advertising in the conduct of business, trade, or commerce, or in the furnishing of any service in the state of New York in violation of New York's General Business Law § 350.

101.    The public is likely to be damaged because of Defendant's deceptive trade practices or acts. Specifically, Defendant's false, deceptive, or misleading statements implicate general consumer-oriented conduct because Defendant sells and distributes its Products to consumers in supermarkets and grocery stores throughout New York.

102.    As such, Defendant's conduct as alleged herein is consumer oriented.

103.    As a result of Defendant's material, false or misleading statements or representations of fact about the Products, Plaintiff and each of the other Members of the Class have sustained damages and are entitled to statutory damages of $500 per unit purchased.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks

a judgment against Defendant, as follows:

a. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class Members;

b. For an order declaring that Defendant is financially responsible for notifying the Class members of the pendency of this suit;

c. For an order declaring that Defendant must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale of the Products, or order Defendant to make full restitution to Plaintiff and the members of the Class;

d. For an order declaring that Defendant's conduct violated the New York Deceptive Trade Practice Act, New York Gen. Bus. Law § 349, *et seq*.;

e. For an order declaring that Defendant's conduct violated the New York Deceptive Trade Practice Act, New York Gen. Bus. Law § 350, *et seq*.;

f. For economic, statutory, and compensatory damages in amounts to be determined by the Court and/or jury;

g. For actual damages sustained and/or treble damages;

h. For punitive or exemplary damages;

i. For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit; and

j. For such other and further relief as the Court may deem proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: September 2, 2022                    Respectfully submitted,

*/s/ Charles D. Moore*
Charles D. Moore
**REESE LLP**
100 South 5th Street, Suite 1900
Minneapolis, MN 55402
Telephone: (212) 643-0500
Facsimile:  (212) 253-4272
Email:  cmoore@reesellp.com

**REESE LLP**
Michael R. Reese
Sue J. Nam
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Facsimile:  (212) 253-4272
Email:  mreese@reesellp.com


**SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP**
HELEN I. ZELDES (*pro hac vice* application pending)
*hzeldes@sshhzlaw.com*
JOSHUA A. FIELDS (*pro hac vice* application pending)
*jfields@sshhzlaw.com*
AYA DARDARI (*pro hac vice* application pending)
*adardari@sshhzlaw.com*
501 W. Broadway, Suite 800
San Diego, CA 92101
Tel: (619) 400-4990


**PETA Foundation**
Asher Smith
ashers@petaf.org
Tala DiBenedetto (application for admission pending)
talad@petaf.org
1536 16th St. NW
Washington, DC 20036
Tel: (202) 540-2177
Fax: (213) 484-1648


*Attorneys for Plaintiff and Putative Class Members*